UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>　　　Plaintiff, )<br> )<br>　　　vs. )<br> )<br>JAMES PRANGE, )<br>　　　Defendant. )<br> ) | CRIMINAL ACTION<br>NO.: 11-CR-10415-NMG |

**DEFENDANT JAMES PRANGE'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION TO COMPEL DISCOVERY**

Defendant James Prange has been charged, pursuant to a Superseding Indictment, with: (a) three (3) counts of conspiracy to commit securities fraud and aiding and abetting in violation of 18 U.S.C. §§ 1349 and 2; and (b) eight (8) counts of wire fraud and aiding and abetting in violation of 18 U.S.C. §§ 1343, 1349 and 2.

On February 14, 2012, the government produced its automatic discovery to Prange and his co-defendants. On April 3, 2012, after conferring with his co-defendants, Prange joined in a discovery request letter filed by defendant Steven Berman. On April 17, the government responded. In an effort to resolve or narrow some of the outstanding discovery issues, Berman, on behalf of all defendants sent a follow-up letter to the government. On May 15, 2012, the government responded.

Despite the parties' good faith efforts, certain outstanding discovery issues remain. This memorandum of law will address four related discovery requests: (1) all other audio and/or video recordings of any meetings and/or telephone calls that do not appear on the Interception List, but,

nevertheless, relate to the Investigation; (2) all documents reflecting any investigation by the government concerning China Wi-Max or Berman prior to July 14, 2011, the date of the first intercepted telephone call between CW and Berman that the government has disclosed to date; (3) all materials obtained, whether by seizure or otherwise, from China Wi-Max Communications, Inc. or from any employee, agent or consultant to China Wi-Max; and (4) all materials obtained, whether by seizure or otherwise, from Northern Equity, Inc. or from any employee, agent or consultant to Northern.

## FACTUAL BACKGROUND

In a press release dated December 1, 2011, the U.S. Attorney for the District of Massachusetts, the Federal Bureau of Investigation and the U.S. Securities and Exchange Commission trumpeted the filing of "parallel cases" in federal court against several corporate officers, lawyers and stock promoters alleging that they used "kickbacks and other schemes to trigger investments in various thinly-traded stocks." According to the press release, the "schemes" involved secret kickbacks to an investment fund representative in exchange for having the investment fund buy stock in certain companies; the kickbacks were to be concealed through the use of sham consulting agreements. The press release further revealed that the investment fund representative was, in fact, an undercover FBI agent.

The investigation labeled "Operation Penny Pincher" resulted in criminal charges against thirteen individuals including: (1) Kelly Black-White; (2) James Prange; (3) Michael Lee; (4) Edward Henderson; (5) Paul DesJourdy; (6) James Wheeler; (7) Steve Berman; (8) Richard Kranitz; (9) JC Jordan; (10) Karen Person; (11) Albert Reda; (12) Steve Stuart; and (13) Muhammad ("M.J".) Shaheed. The same press release noted that civil charges of securities fraud were also filed against DesJourdy, Henderson, Lee and Wheeler for allegedly using

kickbacks to manipulate trading in microcap stocks. Also, the press release noted that the SEC suspended trading in seven microcap companies allegedly involved in the kickback-for-investment schemes including: (1) 1st Global Financial, Inc.; (2) Augrid Global Holdings Corp.; (3) ComCam International, Inc.: (4) MicroHoldings US, Inc.; (5) Outfront Companies; (6) Symbollon Corp./Symbollon Pharmaceuticals, Inc.; and (7) ZipGlobal Holdings, Inc.

On December 1, 2011, the government filed informations against Edward Henderson, Michael Lee, James Wheeler and Paul DesJourdy. Henderson was charged with one count of wire fraud whereas Lee, Wheeler and DesJourdy were charged with one count of mail fraud and one count of conspiracy to commit securities fraud. By contrast, the prosecution of defendants Prange, Person, Berman, Kranitz, Jordan, Black-White, Stuart, Reda and Shaheed was initiated pursuant to a criminal complaint based on the affidavit of FBI Special Agent Chris Gianakura. See Case Number 11-MJ-06165-LTS, Docket Entry ("DE") # 2.

According to Special Agent Gianakura's affidavit, the charges arose out of an FBI-run sting operation conducted from October 2010 through at least September 2011. The undercover FBI agent (hereinafter "UA") purported to be a representative of a New York-based investment fund with a satellite office in a Boston suburb (hereinafter "Boston office"). According to Agent Gianakura's affidavit:

> From October 2010 through at least August 2011, UA met with approximately 30 individuals at the Boston Office to discuss potential investment of the Fund's monies. These meetings were surreptitiously recorded; UA knew of, and consented to, the recording. UA generally represented to these individuals that he had investment discretion over a portion of the Fund's monies. UA further generally represented to these individuals that he was willing to invest Fund monies in exchange for a kickback to him of fifty percent of the investment monies – a kickback that the Fund knew nothing of. In effect, UA generally represented that he was willing to enter into agreements with individuals whereby UA would secretly pocket one-half of the monies that he invested on the Fund's behalf.

The individuals who met with the UA during the investigation fell into two general groups. The first group targeted by the UA was individuals who could introduce UA to publicly traded companies in need of capital. These so-called "Finders" were induced into participating in UA's scheme by the promise of a finder's fee or a percentage of the UA's alleged kickback as consideration for making the introduction. However, the finder's fee would be paid only if a publicly traded company was also duped into paying the UA a kickback. Of course, the second group of individuals was executives of publicly traded companies in need of capital. These executives were induced into participating in UA's scheme by the promise of substantial investments into their financially challenged companies.

Over the course of 11 months, from October 2010 until August 2011, the UA met with approximately 30 individuals. Of these 30 individuals, only 13 have been charged in connection with the UA's alleged scheme. To date, the 17 individuals that were targeted, but not charged, have not been identified.

I. THE GOVERNMENT SHOULD BE ORDERED TO PRODUCE EVERY AUDIO AND VIDEO RECORDING IN ITS POSSESSION THAT RELATES TO THE OPERATION PENNY PINCHER INVESTIGATION.

Without repeating what has already been set forth in defendant Richard Kranitz's Motion to Compel Discovery, defendants define the investigation referred to as "Operation Penny Pincher" as the entire investigation referenced in Special Agent Gianakura's affidavit. As noted in defendant Richard Kranitz's Motion to Compel, the entire investigation includes multiple agencies including the FBI and SEC. Unlike the government, which has taken a narrow view of the investigation, defendants seek discovery from all law enforcement agencies involved in the investigation, including the FBI and the SEC. Indeed, defendants' request seeks access to "all other audio and/or video recordings of any meetings and/or telephone calls that do not appear on

the Interception List, but, nevertheless, relate to the Investigation." Specifically, defendants seek each and every audio and video recording made during the investigation in which either the UA or any of the so-called "Finders" participated. To be clear, defendants' request is not limited to audio and video recordings of the 13 defendants who have been charged. Rather, defendants request every audio and video recording of the 30 individuals who were targeted, including the 17 that were not charged with any crime.

In support of this request defendants note that from the discovery provided to date, it is clear that one or more of the defendants will be asserting the defense of entrapment. To show that defendants were not entrapped, the government must establish one of the following two facts beyond a reasonable doubt. First, the government must prove that the UA did not persuade or talk defendants into committing the crimes at issue. Second, the government must prove that defendants were ready and willing to commit the crime without any persuasion from the UA or any government agent. See Instruction Number 5.05, *Pattern Criminal Jury Instructions for the District Courts of the First Circuit* (Hornby, J. revisions April 3, 2012)

With respect to the first factor, giving someone an opportunity to commit a crime is not the same as persuading him, but persuasion by false statements, excessive pressure or undue appeal to sympathy can be improper. Moreover, with respect to the second factor, additional facts such as (a) the character or reputation of the defendant; (b) whether the initial suggestion of criminal activity was made by the government or its agent; (c) whether the defendant was engaged in the criminal activity for profit; (d) whether the defendant showed reluctance to commit the offense; (e) whether that reluctance reflects the conscience of an innocent person or merely the caution of a criminal; (f) the nature of the persuasion offered by the government; and (f) how long the government persuasion lasted are all relevant considerations. Id.

In addition, how the UA and Finders conducted themselves in connection with the 13 defendants who were charged with crimes as well as the 17 individuals who were not charged with crimes is likely fertile grounds for both exculpatory and impeachment information. For example, a review of the Information filed against Michael Lee demonstrates that the "pitch" made by the UA evolved over the course of the investigation. Specifically, in the Lee Information, in November 2010, when Lee met with the UA, the size of the kickback to the UA was 35%, but 20% was to be returned to Lee. In this "pay to play" arrangement, Lee was allegedly told that the UA or purported fund representative would "violate his fiduciary duty to the fund and its investors by causing the fund to purchase stock that it otherwise would not have purchased, in exchange for a direct personal benefit." However, by May 2011, the "pitch" made to Wheeler and DesJourdy, was similar to the inducements made to defendant Prange and involved the use of the term "kickback".

Also, defendants note that of the 13 defendants charged with crimes by the government, the government unilaterally decided to charge 4 of the defendants by way of information (Lee, Henderson, Wheeler and DesJourdy). At the same time, the government charged the remaining 9 defendants in 3 separate indictments. In the case before the Court, the government grouped defendant Prange with defendants Berman, Kranitz, Person and Jordan. In a separate filing, the government grouped defendant Kelly Black-White, with Albert Reda and Stephen Stuart. Finally, the government decided to file a separate indictment against defendant Muhammad Shaheed. Whatever reasons the government had for grouping the defendants as it did should not be a justification for preventing defendants from having full access to audio and video recordings of all the defendants. This is particularly true to the extent that the audio and video recordings involve the same UA and, more importantly, the same CW as involved in defendants' case.

<u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny, imposes upon the government a continuing obligation to produce all evidence required by the law and the Federal Rules of

Criminal Procedure. See id. at 87 (holding that due process requires disclosure of "evidence [that] is material either to guilt or to punishment" upon request); Kyles v. Whitley, 514 U.S. 419, 437-38 (1995) (holding that the obligation to disclose includes evidence "known only to police investigators and not to the prosecutor," and that "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf ..., including the police."); United States v. Agurs, 427 U.S. 97, 107 (1976) (holding that the duty to disclose exculpatory evidence applies even when there has been no request by the accused); Giglio v. United States, 405 U.S. 150,153-54 (1972) (holding that Brady encompasses impeachment evidence); see also Fed. R. Crim. P. 16(a) (outlining information subject to government disclosure); United States v. Marshall, 132F.3d 63, 67 (D.C. Cir. 1998) (holding that the disclosure requirements of Fed. R. Crim. P. 16(a)(1)(C) apply to inculpatory, as well as exculpatory, evidence).

Moreover, the government's obligation to provide exculpatory evidence pursuant to Brady in a timely manner is not diminished either by the fact that such evidence also constitutes evidence that must be produced later pursuant to the Jencks Act, 18 U.S.C. § 3500, or by the fact that such evidence need not be produced according to Rule 16. See United States v. Tarantino, 846 F.2d 1384, 1414n.11 (D.C. Cir. 1988); see also Advisory Committee Note to Fed. R. Crim. P. 16 (1974) ("The rule is intended to prescribe the minimum amount of discovery to which the parties are entitled."). Where doubt exists as to the usefulness of the evidence to the defendant, the government must resolve all such doubts in favor of full disclosure. See United States v. Paxson, 861 F.2d 730,737 (D.C. Cir. 1988).

The Department of Justice's current policy on exculpatory information states that it "must be disclosed to defendant reasonably promptly after discovery." See *Guidance for Prosecutors*

*Regarding Criminal Discovery*, U.S. Attorney Manual, 9-5.001 (hereinafter "Ogden Memo"). Impeachment information, which depends on the prosecutor's decision on who is or may be called as a government witness, will typically be disclosed within a reasonable time before trial. However, in this case, there is no dispute that the government will call both the UA and CW as witnesses at trial. Moreover, given the volume of materials involved, defendants submit that the only way for the trial to proceed efficiently is to have the government disclose to the defendants all exculpatory and impeachment information well in advance of trial. Accordingly, defendants submit that every audio and video recording in its possession that relates to the Operation Penny Pincher investigation should be produced by the government.

    II.    THE GOVERNMENT SHOULD BE ORDERED TO PRODUCE ALL DOCUMENTS REFLECTING ANY INVESTIGATION BY THE GOVERNMENT, INCLUDING BY THE SEC, CONCERNING DEFENDANTS, NORTHERN EQUITY, INC., CHINA WI-MAX, COMMUNICATIONS, INC., SMALL BUSINESS COMPANY, INC. AND VIDA-LIFE INTERNATIONAL, LTD.

To date the government has refused to produce: (1) all documents reflecting any investigation by the government concerning China Wi-Max or Berman prior to July 14, 2011, the date of the first intercepted telephone call between CW and Berman that the government has disclosed to date; (2) all materials obtained, whether by seizure or otherwise, from China Wi-Max Communications, Inc. or from any employee, agent or consultant to China Wi-Max; and (3) all materials obtained, whether by seizure or otherwise, from Northern Equity, Inc. or from any employee, agent or consultant to Northern. Although not specifically requested by defendants previously, the same information should be disclosed with respect to defendants Prange, Kranitz, Person, and Jordan, and Small Business Company, Inc. and Vida-Life International, Ltd.

It is not clear from the discovery provided to date why the defendants were targeted by the government for investigation. Moreover, the government has refused to classify the Securities and Exchange Commission as a member of the prosecution team for purposes of defining its discovery obligations even though it is clear from the government's public announcements that the SEC was intimately involved in the investigation. DOJ policy on discovery obligations involving parallel civil proceedings is clear; where the SEC is a member of the prosecution team, the agency's files should be reviewed.

In the post-Madoff era, the U.S. Attorney's Office, the FBI and the SEC are collaborating on investigations more than ever. Thus, for the government to take the position that it does not have to review the SEC's files for discoverable information in this case lacks merit and should be rejected.

On December 1, 2011, the press release issued by the government quotes David Bergers, Director of the SEC's Boston Regional Office, as follows: "We are committed to working with our law enforcement partners here in Massachusetts, and around the country, to stop abuses in the microcap sector and hold the perpetrators responsible." Clearly, the government should be required to review the files of its "partner" for discoverable information, including without limitation, exculpatory and impeachment information relevant to this case which defendants submit would include all documents reflecting any investigations by the government, including by the SEC, concerning defendants Prange, Berman, Kranitz, Person and Jordan and Northern Equity, Inc., China Wi-Max, Communications, Inc., Small Business Company, Inc., and Vida-Life International, Ltd.

CONCLUSION

For the foregoing reasons, defendant Prange on his own behalf and on behalf of all defendants respectfully request the Court to require the government to produce: (1) every audio and video recording in its possession that relates to the Operation Penny Pincher investigation; and (2) all documents reflecting any investigations by the government, including by the SEC, concerning defendants Prange, Kranitz, Person, and Jordan, and Northern Equity, Inc., China Wi-Max, Communications, Inc., Small Business Company, Inc., and Vida-Life International, Ltd.

Respectfully submitted,<br>
For Defendant,<br>
JAMES PRANGE<br>
By his attorneys,<br>
LAWSON & WEITZEN, LLP<br>
<br>
  /s/ Scott P. Lopez  <br>
Scott P. Lopez, BBO # 549556<br>
Lawson & Weitzen, LLP<br>
88 Black Falcon Avenue, Suite 345<br>
Boston, MA  02210<br>
(617) 439-4990 (tel)<br>
(617) 439-3987 (fax)<br>
splopez@lawson-weitzen.com

Dated:  July 3, 2012

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 3, 2012.

  /s/ Scott P. Lopez  <br>
Scott P. Lopez